## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO

TIG INSURANCE COMPANY,                   §
250 Commercial Street, Suite 5000        §
Hillsborough, NH 03101                   §
                                         §
                  Plaintiff,             §
                                         §        CIVIL ACTION NO.
v.                                       §
                                         §
NATIONAL INDEMNITY COMPANY,              §        JURY TRIAL DEMANDED
1314 Douglas Street, Suite 1400          §
Omaha, NE, 68102-1944                    §
                                         §
                  Defendant.             §

---

## COMPLAINT FOR DECLARATORY JUDGMENT

---

Plaintiff TIG Insurance Company ("TIG") alleges as its Complaint for Declaratory Relief against Defendant National Indemnity Company ("NICO"):

### NATURE OF THE ACTION

1.      TIG's predecessor issued facultative reinsurance certificates to, and agreed to reinsure a policy issued by, Employers Commercial Union Insurance Company, later renamed Commercial Union Insurance Company ("Commercial Union") to The B.F. Goodrich Company, which was subsequently renamed Goodrich Corporation ("Goodrich"). In 2007, judgment was entered in Goodrich's favor establishing that Commercial Union was obligated under policies issued to Goodrich (including the reinsured policy) to pay Goodrich for costs associated with the remediation of a Goodrich facility in Calvert City, Kentucky. Subsequent to that judgment, however, disputes arose regarding the amounts owed by Commercial Union under its policies.

2.      In 2013, NICO entered into a separate guaranty agreement with Goodrich pursuant to which NICO agreed to guaranty Commercial Union's obligations to pay Goodrich for its

remediation costs. Then in 2025, NICO paid Goodrich $31,000,000 under the guaranty pursuant to a settlement agreement between NICO and Goodrich.

3.     NICO has argued that the reinsurance TIG provided to Commercial Union obligates TIG to reimburse NICO for the amounts NICO paid to Goodrich under its separate guaranty and settlement with Goodrich. Because TIG's reinsurance certificates only reinsured amounts paid by Commercial Union under the reinsured policy, and NICO's liability and payment was pursuant to a guaranty agreement completely separate and independent from Commercial Union's reinsured policy, TIG seeks a declaration that it is not obligated to reimburse NICO.

## PARTIES, JURISDICTION, AND VENUE

4.     TIG is a corporation organized under the laws of the State of California with its principal place of business in New Hampshire.

5.     Defendant NICO is a corporation organized under the laws of the State of Nebraska with a principal place of business in Omaha, Nebraska.

6.     This Court has subject matter jurisdiction under 28 U.S.C. section 1332 because there is complete diversity of citizenship and the amount in controversy is greater than $75,000, exclusive of interest and costs.

7.     Venue is proper in this district under 28 U.S.C. section 1391 because a substantial part of the events or omissions giving rise to the parties' dispute occurred in this district.

8.     This matter is properly filed pursuant to the Declaratory Judgment Act, 28 U.S.C. section 2201 and Fed. R. Civ. P. 57, because an actual controversy of a ripe and justiciable nature exists between TIG and NICO.

**GENERAL ALLEGATIONS**

9.      Given the length of the relevant time period, this matter involves entities whose names have changed over time, which have been merged with other companies, or whose interests have been succeeded by different entities. Below is an explanation of those various names:

a.      The International Surplus Lines Insurance Company of Chicago ("ISLIC") issued the reinsurance certificates at issue and Plaintiff TIG is the successor in interest to ISLIC. This Complaint will refer to those entities collectively as "TIG."

b.      The B.F. Goodrich Company was the original named insured under the insurance policies at issue and was subsequently renamed Goodrich Corporation. This Complaint will refer to those entities as "Goodrich."

c.      Employer's Commercial Union Insurance Company issued the policy that was reinsured by TIG and which is the subject of this lawsuit. In 1971, Employer's Commercial Union Insurance Company changed its name to Commercial Union Insurance Company. After some corporate transactions, Commercial Union Insurance Company then changed its name to OneBeacon America Insurance Company in 2001, and OneBeacon America Insurance Company then changed its name to Lamorak Insurance Company in 2015. Lamorak Insurance Company was subsequently merged into Bedivere Insurance Company in 2020. As discussed below, in 2021, Bedivere Insurance Company was placed into liquidation. This Complaint will refer to all of these entities as "Commercial Union."

**The Reinsurance Certificates**

10.      At times relevant to this dispute, Goodrich manufactured parts for the aerospace industry, as well as plastics, sealants, coatings and adhesives, and owned a manufacturing facility in Calvert City, Kentucky (the "Calvert City Site").

11.     The federal government asserted claims against Goodrich alleging violations of the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA") and the Resource Conservation and Recovery Act ("RCRA") for soil and groundwater contamination allegedly caused by Goodrich's manufacturing and wastewater disposal practices at the Calvert City Site from approximately 1963 to 1983 and required Goodrich to address the violations and remediate the contamination (the "Calvert City Claims").

12.     Commercial Union and affiliated companies issued three separate umbrella policies to Goodrich, effective January 1, 1968 to January 1, 1975 (the "Goodrich Policies").

13.     Policy No. E22-8502-173, was effective January 1, 1968 to January 1, 1969. The policy has limits of $40,000,000, excess of the underlying insurance limits/self-insured retentions of $20,000,000 per occurrence.

14.     Policy No. E22-8502-313, was effective January 1, 1969 to January 1, 1972. The policy also has limits of $40,000,000, excess of the underlying insurance limits/self-insured retentions of $20,000,000.

15.     Policy No. EW-8502-711 ("Reinsured Policy") was issued by Commercial Union for the term January 1, 1972 to January 1, 1975. Upon information and belief, the policy was cancelled as of July 1, 1974. The policy has limits of $15,000,000, part of $20,000,000, excess of the underlying insurance limits/self-insured retentions of $20,000,000.

16.     The Goodrich Policies follow form to the terms, conditions and exclusions of certain underlying policies and were subject to $20 million self-insured retentions, as noted above.

17.     TIG, through its predecessor ISLIC, provided facultative reinsurance to Commercial Union for the Reinsured Policy No. EW-8502-711 under two certificates, no. FRO000070 and no. FRO000071 (the "Certificates").

18.     Facultative certificate FRO000070, reinsures Commercial Union for $2 million part of the $15 million, part of $20 million, excess of the $20 million underlying limits of the Reinsured Policy.

19.     Facultative certificate FRO000071, reinsures Commercial Union for $243,250 part of the $15 million, part of $20 million, excess of the $20 million underlying limits of the Reinsured Policy.

20.     The reinsurance TIG provided under the Certificates was subject to the terms and conditions of the Reinsured Policy issued by Commercial Union and obligated TIG to pay Commercial Union a portion of judgments or settlements paid by Commercial Union for claims covered by the Reinsured Policy, as well as a proportion of expenses incurred by Commercial Union in the investigation and settlement of said claims and lawsuits.

21.     There were no parties to the Certificates other than TIG and Commercial Union.

### The Coverage Dispute

22.     In 1999, Goodrich initiated a coverage action in Ohio against insurance companies that had issued policies to Goodrich from 1955 through 1986, including Commercial Union ("Coverage Action"), seeking coverage for the costs Goodrich incurred for the Calvert City Site remediation.

23.     Final judgment was entered in the Coverage Action on January 4, 2007 ("2007 Judgment") in which the court ruled that Commercial Union was liable under the Goodrich Policies for certain costs and fees associated with Goodrich's defense against the government's claims and costs associated with the remediation of the Calvert City Site.

24.     Disputes subsequently arose between Commercial Union and Goodrich regarding the amounts due under the 2007 Judgment, how those amounts should be allocated to and exhaust the limits of the Goodrich Policies, and the structure of the payments.

25.     Commercial Union (OneBeacon at this point in time) and Goodrich entered into a Confidential Settlement Agreement on May 6, 2013 to resolve certain disputes related to the 2007 Judgment and establish an agreed method for payment of certain amounts (the "2013 Settlement").

26.     The 2013 Settlement did not resolve all disputes between Commercial Union and Goodrich, particularly, disputes related to how the payments would be allocated to each policy, treatment of the self-insured retentions, and the total amount owed to Goodrich.

27.     NICO was also a party to the 2013 Settlement but only for the limited purpose of providing a guaranty to Goodrich. Specifically, in the 2013 Settlement, NICO "unconditionally and irrevocably" guaranteed full payment to Goodrich of amounts owed under either the 2013 Settlement or the 2007 Judgment (the "Guaranty").

28.     Under the Guaranty, "NICO waive[d] any and all notices of changes to [Commercial Union's] financial condition or any other fact that might materially increase NICO's risk under this Guaranty" and "waive[d] any defense or circumstance which might constitute a legal or equitable discharge of NICO from this Guaranty."

29.     NICO also agreed that the "Guaranty shall continue to be effective…if at any time, payment, or any part thereof, of any of the Obligations is rescinded or must otherwise be restored or returned by Goodrich to [Commercial Union] or its respective successors or to a custodian, receiver, liquidator, or trustee…."

30.     On June 19, 2018, Commercial Union (now Lamorak) filed a declaratory judgment action against Goodrich ("DJ Action") arguing that all Goodrich Policies, including the Reinsured Policies, were exhausted for the Calvert City Claims.

31.     Goodrich filed a counterclaim in the DJ Action asserting that the limits of the Goodrich Policies should be annualized, that as a result the policies were not exhausted for the

Calvert City Claims, and seeking a declaration that Commercial Union had a continuing obligation to pay under the policies and the 2007 Judgment.

32.     In November of 2018, Commercial Union and Goodrich brought cross motions for summary judgment in the DJ Action asserting their respective theories.

33.     In March 2021, Commercial Union (now Bedivere) was placed into liquidation and filed a notice of the liquidation in the DJ Action.

34.     On June 7, 2021, Goodrich filed a motion seeking leave to amend its Counterclaim to add NICO as a party in order to pursue payments under NICO's Guaranty.

35.     On June 23, 2021, the court issued an order staying the DJ with respect to Commercial Union and granted Goodrich leave to add NICO as a party and assert claims under the Guaranty, holding that despite Commercial Union's insolvency, Goodrich could still bring an independent claim against NICO to recover under the 2013 Settlement because NICO's Guaranty was an independent obligation.

36.     Goodrich and NICO asserted claims against each other in the DJ Action.

37.     In 2022, NICO and Goodrich brought cross motions for summary judgment in the DJ Action asserting similar arguments raised in the 2018 motions—concerning exhaustion of the Goodrich Policies—as well as arguments concerning the basis for NICO's liability to Goodrich. In particular, NICO argued that to establish NICO's liability under the Guaranty, Goodrich must first establish a primary obligation of Commercial Union that Commercial Union failed to satisfy. NICO further argued that because of the liquidation order and the stay, Goodrich was precluded from establishing any obligation of Commercial Union outside the liquidation proceedings.

38.     On May 24, 2023, the court issued an order on the motions for summary judgment ("MSJ Order").

39.     The court rejected NICO's argument that Goodrich would need to file a claim against Commercial Union in the liquidation proceedings or otherwise prove Commercial Union was liable but could not pay before NICO could be found liable on its Guaranty. The court held that Goodrich was not proceeding against Commercial Union under the insurance policies but against NICO under the Guaranty, which the court noted was "not a contract of insurance." It also held that Goodrich's claims did not violate the liquidation order or require Goodrich to assert claims against Commercial Union.

40.     Citing the language of the Guaranty, the court explained that Goodrich was not required to exhaust any remedies or attempt to collect from Commercial Union before pursuing the Guaranty because NICO's obligation was separate and distinct. The court held that NICO "unconditionally and irrevocably agreed to pay Goodrich…regardless of [Commercial Union's] or its successor's financial condition or discharge of obligations due to state or federal insolvency proceedings…."

41.     The court noted that NICO agreed that the Guaranty would continue even "in the event Goodrich had to return payments to [Commercial Union] or to a custodian, receiver, liquidator, or trustee" and that the "guaranty's terms contemplated [Commercial Union's] assets could come into the hands of a custodian, receiver, liquidator, or trustee, and NICO's guaranty to Goodrich would be unaffected."

42.     According to the court, "NICO obligated itself to pay Goodrich, regardless of [Commercial Union's] (or its successor Bedivere's) discharge of its obligations and that "[d]ischarge of [Commercial Union's] obligations through insolvency or bankruptcy proceedings only discharge [Commercial Union]…."

43.     Goodrich and NICO both appealed the order.

44.     While the appeals were pending, on January 29, 2025, NICO and Goodrich entered a settlement agreement ("2025 Settlement"). NICO agreed to pay Goodrich $31 million for its guaranty obligation in exchange for the dismissal of all claims which NICO and Goodrich had asserted against each other in the DJ Action and in satisfaction of all obligations it might have had under the 2013 Settlement, NICO's Guaranty, the 2007 Judgment, and "in any way related to the Calvert City Site."

**The Billing**

45.     On February 28, 2025, NICO, through its affiliate, sent correspondence to reinsurance broker Guy Carpenter regarding the "Reinsurance Settlement and Billing Notice for the 2025 Settlement" which was intended to notify various reinsurers, including TIG, of the $31,000,000 settlement, the date the settlement would be funded, and provide the settlement allocation and reinsurance bill amounts (the "Billing").

46.     NICO claimed that TIG owed NICO $1,368,155.67 under the reinsurance Certificates.

47.     On December 15, 2025, after subsequent discussions with NICO as well as requests and receipt of additional information, TIG responded, disputing the Billing and explaining that it is not obligated to reimburse NICO based on the terms of the Certificates because NICO's liability and payment was made under a Guaranty separate and distinct from the Reinsured Policy. TIG reserved all rights under the Certificates, the underlying policies, and applicable law.

48.     On January 6, 2026, NICO responded, disagreeing with TIG and claiming the amounts were indeed owed under the Certificates.

49.     TIG brings this action seeking a declaration that it is not obligated to reimburse NICO for the Billing or any amounts NICO has paid under its Guaranty related to the Calvert City

9

Claims, the Term Sheet, the Coverage Action, the 2007 Judgment, the DJ Action, or the 2025 Settlement.

**CLAIM FOR RELIEF – DECLARATORY JUDGMENT**

50.     TIG incorporates the allegations in the preceding paragraphs as if fully set forth herein.

51.     This is an action seeking a declaratory judgment pursuant to 28 U.S.C. section 2201 to determine questions in real controversy between the parties.

52.     There is a real, substantial, and justifiable issue in controversy between the parties with respect to the rights and obligations under the Certificates and a declaration of the rights and obligations of the parties is necessary and appropriate.

53.     Simply put, NICO's 2025 Settlement payment for which it seeks reimbursement from TIG was not a payment under the Reinsured Policy or that was reinsured by the Certificates because it was made by NICO pursuant to NICO's separate and distinct Guaranty agreement and was not affected by Commercial Union's liquidation proceedings or discharges of liability in that proceeding.

54.     TIG issued the reinsurance Certificates to reinsure a portion of the Reinsured Policy issued by Commercial Union.

55.     The Certificates are only enforceable, valid contracts between TIG, as successor to ISLIC, and Commercial Union (now known as Bedivere) - not NICO. NICO was not the insurer in the Reinsured Policy and was not a party to the Certificates and thus NICO does not have any rights to recover under the Certificates. The 2025 Settlement payment was made by NICO, not Commercial Union.

56.     Furthermore, TIG's obligations are limited by the terms and conditions of the Certificates. Under the Certificates, TIG was only obligated to pay Commercial Union a portion

of judgments or settlements paid by Commercial Union for claims covered by and paid under the Reinsured Policy, as well as a proportion of expenses incurred by Commercial Union in the investigation and settlement of said claims and lawsuits.

57.     Commercial Union was in liquidation proceedings before the 2025 Settlement and thus the 2025 Settlement payment was not paid under or pursuant to the Reinsured Policy, which was an asset of the liquidating estate of Commercial Union.

58.     As a result of the liquidation proceeding, any liability or claim for payment under the Reinsured Policy would have been subject to the liquidation stay, would have required submission of a proof of claim in the liquidation proceeding, and the amount of payment would be subject to the availability of the liquidating estate's assets and subject to the distribution process of the liquidation proceedings. No such judgment or distribution was entered in the liquidation proceedings and a payment made under the Reinsured Policy pursuant to the liquidation proceedings necessarily would have been far less than the $31,000,000 paid by NICO.

59.     As the court confirmed in its MSJ Order in the DJ Action, NICO's obligations under its Guaranty agreement with Goodrich were separate, distinct, and independent of both the Reinsured Policy and Commercial Union's liability or obligations under the Reinsured Policy. Indeed, as the court held, NICO's obligations and liability under the Guaranty were unaffected by Commercial Union's liquidation and the discharges of Commercial Union's liabilities in connection with those liquidation proceedings.

60.     NICO made the 2025 Settlement payment to fulfill its distinct obligations under its Guaranty agreement with Goodrich and to resolve the claims between NICO and Goodrich in the DJ Action related to the Guaranty, the 2007 Judgment, and the Calvert City Claims. As the court explained in its Summary Judgment Order, Goodrich was pursuing claims against and amounts

owed by NICO under the Guaranty, not claims against or amounts owed by Commercial Union, and Commercial Union's liquidation did not preclude those claims. The settlement and thus NICO's payment was under its Guaranty and resolved the claims Goodrich asserted against NICO, not Commercial Union.

61. As a result, the 2025 Settlement payment arose and was made independently and separate from the terms, conditions, and coverage of the Reinsured Policy and the payment does not constitute amounts owed under the Certificates.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, TIG Insurance Company prays for the following judgment:

1. An order of the Court declaring the rights and responsibilities of the parties and specifically that TIG has no obligation to pay or reimburse NICO for any amounts it paid in connection with the 2025 Settlement, the 2007 Judgment, or the Calvert City Claims, including but not limited to the amount submitted to TIG by NICO in the Billing.

2. An award of costs and attorney fees as may be permitted; and

3. For such other and further relief as the Court may deem just and proper.

Dated: May 12th, 2026

Respectfully submitted,

*/s/ Molly S. Crabtree*
Molly S. Crabtree (Ohio Bar No. 0073823)
Porter Wright Morris & Arthur LLP
41 South High Street, Suites 2800-3200
Columbus, OH 43215
Phone: (614) 395-8494
Fax:    (614) 227-2100
mcrabtree@porterwright.com

*Attorney for Plaintiff TIG Insurance Company*

12

27672259.1